

**ROBERT A. GORDON**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| Kathryn Jane Spearman | * | Case No.   17-12663-RAG |
| Debtor | * | Chapter 7 |
| *   *   *   *   *   *   *   * | * | |
| Christopher W. Nicholson, Esquire and Sally B. Gold, Esquire | * | |
| Plaintiffs | * | |
| vs. | * | Adversary No. 17-00202 |
| Kathryn Jane Spearman | * | |
| Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OF DECISION</u>

Plaintiffs Sally B. Gold and Christopher W. Nicholson bring this ten-count complaint against the Debtor and Defendant Kathryn Spearman seeking to deny the discharge of her debts under 11 U.S.C. §§ 727 (a)(2), (4), (5), and (7).  The complaint alleges that the Debtor failed to disclose numerous financial transactions and assets, made false oaths in her bankruptcy case, and failed to explain prepetition losses.  The Debtor opposes the relief.  The Court held a trial over four days, followed by a further, supplemental evidentiary hearing.  Upon consideration of all evidence and testimony, and the credibility of witnesses, including the Chapter 7 Trustee, Mark

1

Freidman, the Debtor's Counsel and especially the Debtor herself, the Court concludes that the Debtor is entitled to her discharge and will dismiss the complaint.[1]

## Statement of Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). The Court finds that the entry of a final judgment will not offend the strictures of *Stern v. Marshall*, 564 U.S. 462 (2011) and is in compliance with *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015). Venue is proper under 28 U.S.C. § 1409(a).

## Introduction

Fairly early in this adversary proceeding, it became apparent that the Debtor had made misstatements and omissions in both her original and amended Schedules and Statement of Financial Affairs (SOFA). Hence, the critical issue became whether the Debtor acted with the requisite intent to be denied a discharge under the governing provisions of the Bankruptcy Code. In denying the Plaintiffs' Motion for Summary Judgment, this Court stated:

> … Ms. Spearman denies that any alleged concealment or statements under oath were made willfully or with specific intent to defraud. Ms. Spearman argues that her failures are mitigated by amendments to her Schedules and Statements or by the inclusion of some of the information on other required documents. Hence, the question is whether a trial should be held to judge her credibility and draw conclusions as to her intent at the time of the acts committed.

ECF 39 at 2. The Court concluded that whether the Debtor acted with the requisite intent must be determined at trial:

---

[1] This opinion is completed and signed on the last day of my 14-year judicial term. Thanks are in order for Kerry Hopkins Blomster and Chief Judge Catliota for their support in completing this opinion. Thanks are also in order for the many, many individuals who supported the effort in favor of a second judicial term. I was touched by your sincere, heartfelt words and the memory of them will remain with me forever.

2

Generally speaking, deciphering a debtor's motivation or intent is a question of fact. *See e.g.*, *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) ("Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact."); *Ford v. Poston*, 773 F.2d 52, 55 (4th Cir. 1985) (the "question of whether a debtor has the requisite intent is a question of fact"). Ms. Spearman's intent is the real, and perhaps only, material question presented. While Plaintiffs argue that Ms. Spearman's actions constitute a "pattern of omissions and inaccuracies" that could be considered "the functional equivalent of fraud in these circumstances", *Hyun Suk Cho v. Seung Chan Park (In re Seung Chan Park)*, 480 B.R. 627, 637 (Bankr. D. Md. 2012), and might support an inference of fraud, the question of Ms. Spearman's actual intent remains paramount, even where the occurrence of such a pattern is evident. *See also In re Johnson*, 139 B.R. 163, 170 (Bankr. E.D. Va. 1992). Because determinations concerning fraudulent intent are dependent upon the assessment of the credibility and demeanor of witnesses, this issue is best left to be resolved at trial.

*Id*. at 2.

After four days of trial, during which the Court carefully observed the Debtor's demeanor, the Court concluded that the Debtor had, "provided her financial information to her attorney Robert Grossbart, Esquire, (who also represented her at trial), and that she relied upon his expertise to properly complete her SOFA and Schedules …."  ECF 77 at p. 3.[2]  As the Court noted, "[t]his may be a valid defense."  *Id.*  Nevertheless, the Court further observed that

it was Ms. Spearman who alone testified to the particulars of the defense without any insight from Mr. Grossbart.  Reading her testimony, with a clear recollection of her demeanor on the witness stand, I could not help but wonder, again and again, what light Mr. Grossbart's testimony could shed on the particulars of each individual omission, the overall process that led up to the commencement of the case, and its early days.

*Id*.  Ultimately the Court determined that complete justice could not be accomplished in this proceeding without first calling Mr. Grossbart to testify as to the (1) the financial information provided by Ms. Spearman and (2) the reasons why much of it was not included in her original

---

[2] The Court likewise noted the testimony of the Trustee, Mr. Friedman, his thorough investigation and his conclusion that nothing either actionable or improper had occurred.  *Id.*

and amended statement of affairs. *Id*. at 4. The Court therefore took the unusual but necessary step of reopening the proceeding to allow Mr. Grossbart to testify.[3] Mr. Grossbart has now testified, and the matter is ripe for decision.

Throughout this process, and again in this Memorandum, the Court is mindful of the many thoughtful decisions holding that misstatements and omissions on a debtor's statement of financial affairs and schedules cannot be readily overlooked. Generally speaking, defenses such as a debtor innocently forgot to list a particular asset, did not know an asset was required to be listed, or simply did not review the schedules before filing, do not usually present a viable defense to a § 727(a)(2) or (4) challenge to discharge. Often, a debtor lacks credibility in asserting such a defense and the absence of credibility is revealed during testimony, in the courtroom. Further, the law imposes burdens on debtors to comply with their obligations under the Bankruptcy Code, and the failure to comply with those obligations has consequences. Hundreds of thousands of bankruptcy cases are filed every year in the U.S. If debtors were routinely permitted to justify failures to produce material information with empty excuses and hollow rationalizations, and thereby evade sound objections to discharge, the flood gates of dishonesty would fly open and the system's underlying integrity would be washed away. Courts have at times denied a discharge due to the sheer volume of misstatements or omissions. *See* ECF 77 at p. 2.

The foregoing does not mean, however, that a strict liability standard applies to a § 727(a)(2) or (4) claim. To the contrary, § 727(a)(2) requires a showing that a debtor acted "with intent to hinder, delay or defraud a creditor." Section 727(a)(4) requires that a debtor acted

---

[3] The Court initially intended to reconvene the trial to receive Mr. Grossbart's testimony but decided to accept, without objection from either side, the deposition testimony he gave in advance of the scheduled hearing. ECF 124.

"knowingly and fraudulently."  Cases must still be decided on the particular facts presented, including, perhaps most importantly, the credibility of witnesses, with a particular focus upon the debtor.

This case was filed after a bitter, years-long divorce proceeding.  The divorce included assertions of the most vile, emotional, and troubling domestic abuse perhaps imaginable.  Although a state court judge ruled against the Debtor in the divorce, it is just as apparent that the Debtor carried the trauma and scars of her beliefs into this case and continues to suffer from them to this day.  On the eve of her filing, when she met with her attorney to provide the necessary financial information, she described the underlying allegations to her attorney in very emotional terms.  He testified he had never heard anything like it during his 32 years of practicing law.  As a result, he prepared the filings in an unsettled, hurried manner and mistakes were made.  When the circumstances were explained to Mr. Friedman, the Trustee, and all relevant information and documents provided, he proceeded with understanding and saw no reason to make any accusations or take any precipitous action.  And the Court again points out that the Debtor gained nothing, and stood to gain nothing, from the misstatements and omissions.  These matters are addressed further herein.  It is sufficient to say here that the Court concludes the Debtor lacked the requisite intent to be denied a discharge and that this is the unusual case where the entire context fully supports that conclusion, notwithstanding the volume of mistakes.

## **Findings of Fact**

The Debtor filed for Chapter 7 relief on February 28, 2017 (the "Petition Date").  The Debtor has been represented throughout this bankruptcy case and adversary proceeding by Mr.

5

Grossbart.  Mark J. Friedman was duly appointed as the Chapter 7 Trustee in the Debtor's bankruptcy case and continues to serve in that role.

Prepetition, the Debtor was a party in a lengthy, bitter and costly divorce proceeding with her former spouse in the Circuit Court of Maryland for Baltimore City, Case No. 24-D-15-002111 (the "Divorce Case").  Plaintiff Christopher W. Nicholson, Esq. is an attorney licensed to practice law in the State of Maryland.  The Debtor engaged him to represent her in the Divorce Case.  Mr. Nicholson generated fees and expenses from July 24, 2015, to February 22, 2016, in the unpaid amount of $125,509.27.  Likewise, Plaintiff Sally B. Gold, Esq. is an attorney licensed to practice law in the State of Maryland.  The Debtor engaged Ms. Gold to represent her in the Divorce Case.  Ms. Gold generated fees and expenses from September 29, 2015, to February 22, 2016, in the unpaid amount of $44,471.14.

A dispute arose between the Debtor and the Plaintiffs over the payment of their fees and the representations ended on February 22, 2016.[4]  The Plaintiffs sued the Debtor in the Circuit Court of Maryland for Baltimore City in August 2016, seeking to collect the unpaid fees and expenses (the "Collection Action").

The Divorce Case resulted in the issuance of a Judgment of Absolute Divorce dated October 11, 2016 ("Divorce Judgment").  Plaintiffs' Ex. ("PX") 5.  The Divorce Judgment provided, among other things:

- The Debtor was to receive child support in the amount of $3,000 per month beginning November 1, 2016;

- The Debtor was to receive alimony in the amount of $5,000 per month for thirty-six (36) months beginning November 1, 2016;

---

[4] The dispute was explained from both points of view during the trial.  In sum, I conclude that it revolved around a failure of communication and cooperation between the Plaintiffs and the Debtor's father who assumed responsibility (without liability) for paying the fees.

6

- The Debtor was to receive a transfer and assignment into an Individual Retirement Account ("IRA") in the amount of $105,605 representing one-half of her former husband's 401k account with T. Rowe Price U.S. Retirement Program as of June 30, 2016;

- The Debtor was to receive a transfer of funds equivalent to twenty-five percent (25%) of the gross value of the former husband's interest in T. Rowe Price Restricted Stock;

- The Debtor was to receive title to a 2015 Honda Odyssey automobile upon the transfer of her former husband's interest in the vehicle to the Debtor, with the former husband satisfying the lien against the car;

- The Debtor was the sole owner of 5403 Purlington Way, Baltimore, MD 21212 (the "Purlington Property") and entitled to retain one hundred (100%) of the proceeds of its sale;

- The Debtor and her former husband owed the Best Interest Attorney, Renee Bronfein Ades, the amounts of $174,827.74 and $105.539.33, respectively. The Debtor's former husband agreed to pay the amount he owed to Ms. Ades ($105,539.33) and half of the amount owed by the Debtor ($87,413.87). The Debtor was responsible for paying the other half of the fees she owed to Ms. Ades ($87,413.87).

*See* PX 5.

While the Debtor was waiting for the Circuit Court to resolve the Divorce Case, she met with Mr. Grossbart on September 19, 2016. The Debtor and Mr. Grossbart had no prior relationship; the Debtor was referred to him by her divorce attorney. The Debtor had paid, often with assistance, huge amounts in connection with the Divorce Case and custody dispute and had very limited resources. Depending upon how the Circuit Court ruled, there could well have been a need for bankruptcy relief. At that meeting, which lasted less than thirty minutes, Mr. Grossbart provided a general overview of how bankruptcy worked. He did not ask her to bring any financial records or other documents to the meeting, and none were brought. Likewise, the

sad details of the allegations made in the domestic dispute were only briefly mentioned and not fully delved into.

They next met on January 30, 2017.  This meeting had more urgency because the Collection Action was active and the Circuit Court had issued the Divorce Judgment.  Either before or at the meeting, Mr. Grossbart provided the Debtor with his firm's standard list of documents to produce and the Debtor began sending documents by email to Mr. Grossbart.  Mr. Grossbart believed the Debtor should file bankruptcy before she defaulted on procedural obligations in the Collection Action.

They met again on February 27, 2017, the eve of her bankruptcy filing.  By that time, Mr. Grossbart had received a substantial number of documents from the Debtor, including among other things, the Divorce Judgment, tax returns for 2016 and 2015, bank account statements, promissory notes to her parents, and valuations of jewelry.  At this meeting, the Debtor and Mr. Grossbart went over the Debtor's financial condition, which was relatively simple at that point. The Debtor was a part-time nursing student and did not work outside the home, and so whatever funds she expected to receive would come from the Divorce Judgment.  The Debtor explained she received $5,000 per month in alimony and $3,000 per month in child support.  Consistent with the Divorce Judgment, she had received cash from recently selling a car, had received the proceeds from her former husband's sale of stock, and expected to receive $105,605 from his IRA, which was to be rolled into a new IRA.  She did not have other sources of income, although, as discussed below, some friends provided her a few hundred dollars here and there to help her make ends meet.  The Debtor discussed the Divorce Case and they went through the Divorce Judgment.  The cost of the divorce had been substantial.  Mr. Grossbart learned of,

> the various monies that came either directly to her or to vendors, lawyers who were providing services to her, because it was huge.  And I remember getting

8

> answers about things she had liquidated to pay her lawyer, [the Plaintiffs], forensic people, psychologists, there was a lot. There was a feeding frenzy, so a lot of money was spent on her behalf by her - - mainly her parents, but she liquidated everything that she owned. She -- she had a fire sale.

ECF 136, Tr. 25:7-15. The Debtor had liquidated stock and her IRA, sold a car, and owed her parents $600,000 - $700,000 to help pay the costs of the divorce.

The Debtor then opened up to Mr. Grossbart about the details of the divorce. She had previously told Mr. Grossbart she alleged in the divorce her firm belief that her husband had sexually abused their minor children. But it was not until the February 27th meeting that she bore down into the specifics. Mr. Grossbart explained his reaction to what Ms. Spearman told him that day:[5]

> The room changed that minute, the meeting changed, everything changed. It was - - I was hit in the face. I don't even recall where I was in the meeting at that point. I'm telling you if you're not human you would have had a similar reaction to me. It was unbelievable. So normally at this point I would say to myself, at least from a professional standpoint, this is a bear [sic] bones. I got to -- I got to take a breather. I got to have another meeting with this lady, but then another side of me said I don't want to bring her back. Every time she comes here is a torture for her. It's terrible. And -- and I already thought that from the other two meetings. This meeting went woo, I thought the other meetings were bad, this is really bad. And it - - it floored me. And it became, - - the whole case just took on this different tenner [sic] to it.
>
> *****
>
> It was hard to ask questions at that point. So she came in the next day to sign and we talked, I think at night to try to - - it was easier by e-mail or it was easier by phone. Looking at her face was tough.

*Id*., Tr. 45:10-46:5, 46:11-14.

This meeting lasted several hours and was very emotional. Debtor recalled "getting really

---

[5] By agreement of the parties, and as ordered by the Court, Mr. Grossbart's deposition transcript taken under a subpoena duces tecum was filed under seal. ECF 121, but was subsequently also filed unsealed with the specific page and line numbers in which he describes the details of the allegations redacted. ECF 136. The Court will not repeat those details here, except to say Mr. Grossbart's reaction to the details is warranted. The Court will also point out that the Circuit Court for Baltimore City ruled that there had been no child abuse or neglect. Nevertheless, the Court is convinced that Ms. Spearman was convinced of the truth and horrific seriousness of the allegations she made.

distressed" and "freezing up" from going through all of the history.  ECF 65, Tr. 188:6-10.  Mr.
Grossbart eventually stated "we've had enough for today" and concluded the meeting.  *Id.*, Tr.
188:10-12.  In this unprecedented and unsettled frame of mind, Mr. Grossbart prepared the
petition, schedules and other filings to initiate the case.  They were certainly not perfectly
prepared, and admittedly contain inaccuracies and misstatements.  The Debtor returned to Mr.
Grossbart's office to review and sign the documents.  That meeting was under an hour because
the Debtor had asked a friend to watch one of her children while she attended the meeting and
there was a level of urgency due to the upcoming discovery deadline in the Collection Action.
*Id.*, Tr. 188-89.  The documents were filed on February 28, 2017 (the "Petition Date").  Along
with the petition, Mr. Grossbart filed a Statement of Financial Affairs for Individuals Filing for
Bankruptcy (Form 107) (the "Initial SOFA"), and Schedules of Assets, Liabilities, Income and
Expenses (Forms 106) (the "Initial Schedules").  PX 6.  Also on the Petition Date, Mr. Grossbart
filed Official Form 122A-1 setting forth the Debtor's Means Test calculation (the "Means Test").
PX 27.

　　　Mr. Grossbart testified that he made a "mistake" by not filing the case as a "bare bones."
ECF 136, Tr. 48: 4-5.[6]

> So the mistake I made was it should have been a bare bones.
>
> 　　　　　　*****
>
> Because then we could have had some more distance and have her review things in
> a - without me asking her questions, just having her review - as - as in-depth
> as possible and - - but she had this need to stop this litigation from his clients,
> so we had to get something filed to stop the litigation she was not answering

---

[6] In bankruptcy parlance, a "bare bones" filing occurs when debtor's counsel files a petition and only the other
essential initial filings.  Then, a motion to extend the time to file the Schedules and Statement of Financial Affairs
will be filed and that is routinely granted.  In this way, the case is initiated and the automatic stay activated, but
debtor and counsel have additional time to more thoughtfully prepare the Schedules and Statement of Financial
Affairs.

her discovery and she couldn't afford her lawyer.  So there was a sense of urgency, sort of like a foreclosure not as - - well, similar.

*****

And I didn't [file case as a "bare bones"].  I don't know why I didn't.  I didn't. Well, I shouldn't say I don't know why.  I know why I wanted to keep her from having to come to my office.

*****

I made a choice.  And -- which subsequently - I did amend.  The first amendment I did.

*Id.*, Tr. 58:4-5, 58:10-59:2, 59:4-9.

Mr. Grossbart is correct that the filing of a "bare bones" case likely would have alleviated much of the dispute in this proceeding.  He candidly admitted that the Debtor provided him with all important information and did not conceal any financial information from him.  In sum, he took full responsibility for the inaccuracies and misstatement asserted by the Plaintiffs.

The Clerk issued the Notice of Chapter 7 Bankruptcy Case on February 28, 2017, notifying creditors that the meeting of creditors required by § 341 of the Bankruptcy Code (the "Meeting of Creditors") would take place on March 31, 2017.  The Notice of Chapter 7 Bankruptcy Case also notified creditors that the deadline to object to the Debtor's discharge or to challenge the dischargeability of certain debts was May 30, 2017.

On March 24, 2017, less than a month after the Debtor filed her bankruptcy case and prior to the Meeting of Creditors, the Debtor filed amended Schedules A/B (Property), C (Property Claimed as Exempt), I (Income) and J (Expenses) (collectively, the "Amended Schedules").  PX 12.

The Trustee, Mr. Friedman, conducted the Meeting of Creditors on March 31, 2017 as scheduled.  The Plaintiffs did not attend the meeting.  Prior to the meeting, Mr. Friedman reviewed the Initial Schedules and obtained an understanding of the Debtor's financial condition. He had some questions about the Debtor's submissions and sent a list to Mr. Grossbart, who

timely responded.  Mr. Friedman has been an attorney for forty years and a Chapter 7 Trustee for

25 years.  The Debtor cooperated with his administration of the case and fully provided him with

all information he needed or requested.  He was satisfied that he received sufficient information

to perform his functions as Trustee.  The Debtor left the Meeting of Creditors believing that Mr.

Friedman was satisfied with the information she provided, and she did not believe she was

required to further amend her Schedules.  In Mr. Friedman's view, as expressed in his sworn

testimony, her belief in this regard was correct.

Plaintiffs commenced the instant adversary proceeding on May 26, 2017.  Plaintiffs filed

a Motion for Summary Judgment on February 1, 2018, that relied upon the quantum of the

mistakes as being sufficient to deny the Debtor's discharge.  On February 20, 2018, the Debtor

filed an Opposition to the Motion for Summary Judgment and filed a second set of amended

Schedules (the "Second Amended Schedules") and an amended Statement of Financial Affairs

(the "Amended SOFA") in her main bankruptcy case.  PX 28 and 29, respectively.  The Second

Amended Schedules and the Amended SOFA cured nearly all the deficiencies extant in the prior

versions.

## Conclusions of Law

Section 727 of the Bankruptcy Code "allows debtors to receive a general discharge of

their debt in keeping with the Code's purpose of giving honest debtors a fresh start 'unhampered

by the pressure and discouragement of preexisting debt.'" *Wachovia Bank, N.A. v. Voccia (In re*

*Voccia)* 477 B.R. 625, 631 (Bankr. E.D. Va. 2011)(citing *Farouki v. Emirates Bank Int'l, Ltd.,*

14 F.3d 244, 249 (4th Cir.1994)).  "However, provisions enumerated in § 727(a)(1)-(10) prohibit

a discharge for those who 'play fast and loose with their assets or with the reality of their

affairs.'"  *Id.* (citing *Farouki,* 14 F.3d at 249).  In all exceptions to, and denial of, discharge

cases, a creditor must prove their allegations by a preponderance of the evidence, *Grogan v. Garner,* 498 U.S. 279, 287 (1991), and all exceptions to discharge are strictly construed against the creditor.  *In re McNallen,* 62 F.3d 619, 625 (4th Cir.1995); *Combs v. Richardson,* 838 F.2d 112, 116 (4th Cir.1988).  "Although the burden may shift to the debtor to provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the ultimate burden rests with the creditor."  *Farouki,* 14 F.3d at 249.

Here, Plaintiffs seek to deny the Debtor's discharge under §§ 727(a)(2)(A), (a)(4)(A), (a)(5) and (a)(7).  Other than the § 727(a)(7) claim, there is substantial overlap in the Plaintiffs' claims among the provisions of §§ 727(a)(2)(A), (a)(4) and (a)(5).  Thus, for example, where the Plaintiffs contend the Debtor failed to disclose an asset on a schedule filed under penalty of perjury, Plaintiffs contend the failure is both a concealment under § 727(a)(2)(A) and a false oath under § 727(a)(4)(A).  For that reason, the Court will first state the legal standards applicable to Plaintiffs' §§ 727(a)(2)(A), (a)(4)(A), (a)(5) claims, and will then address the application of those standards to the facts as determined after trial.  Plaintiffs' claims under § 727(a)(7) are addressed separately below.

**Section 727(a)(2)(A)**

Section 727(a)(2)(A) provides:

(a) The court shall grant the debtor a discharge, unless--

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

  (A) property of the debtor, within one year before the date of the filing of the petition . . . [.]

11 U.S.C. § 727(a)(2)(A).  To bar a debtor's discharge under § 727(a)(2)(A), the plaintiff must prove each of the following four elements by a preponderance of the evidence: (1) the debtor

transferred, removed, destroyed, mutilated or concealed; (2) his or her property; (3) within one

year of the bankruptcy petition's filing; (4) with the actual intent to hinder, delay, or defraud a

creditor. *Id.* "Because direct evidence of a debtor's intent usually will be unavailable, it may be

inferred from the circumstances surrounding his objectionable conduct." *In re Krehl*, 86 F.3d

737, 743 (7th Cir. 1996). The intent determination is a question of fact that is highly dependent

on a bankruptcy court's assessment of the debtor's credibility and its determination as to whether

the debtor intended to defraud the plaintiff by considering certain factors that may support a

finding of actual intent to defraud. *See Hong Kong Development Corp. v. Dung Anh Phan (In re*

*Dung Anh Phan)*, 607 B.R. 598, 609 (Bankr. S.D. Tex. 2019); *see also Jahn v. Hughes (In re*

*Hughes)*, 490 B.R. 784, 792 (Bankr. E.D. Tenn. 2013). In the Fourth Circuit, these factors or

"badges of fraud" include: (1) whether there is a lack or inadequacy of consideration for the

transfer; (2) whether there is a family or insider relationship between the parties; (3) whether

there is some retention of possession, benefit or use of the property in question by the debtor; (4)

whether the financial condition of the debtor before and after the transfer is suspicious; (5)

whether there is a pattern or series of transactions after the onset of the financial difficulties or

pendency of threat of suit by creditors; (6) whether there is a suspicious chronology of events

and transfers; (7) whether the debtor attempted to keep the transfer a secret; and (8) the

proximity of the transfer to the debtor's bankruptcy filing. *See Lafarge N.A., Inc. v. Poffenberger*

*(In re Poffenberger)*, 471 B.R. 807, 816 (Bankr. D. Md. 2012)(citing *Zanderman, Inc. v.*

*Sandoval (In re Sandoval),* No. 96-2391, 1998 WL 497475, at *2 (4th Cir. Aug. 10, 1998)). The

presence of one of these factors can support a finding of fraudulent intent while "the presence of

several factors can lead inescapably to the conclusion that the debtor possessed the requisite

intent." *Id.* (quoting *In re Sandoval* 1998 WL 497475, at *2).

**Section 727(a)(4)(A)**

Section 727(a)(4) of the Bankruptcy Code provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To be denied a discharge under this section, the debtor must have made a statement under oath that he knew to be false; he must have made the statement willfully, with intent to defraud; and the statement must relate to a material matter. *See Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987)(citing 4 *Collier on Bankruptcy* ¶ 727.04[1], at 727–54 to −55 (L. King 15th ed. 1987)). "Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact." *Id.* Once it reasonably appears that the debtor has made a false oath, the burden falls upon the debtor to come forward with evidence that he has not committed the offense charged. *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 482 (E.D. Va. 1997)(quoting *In re Johnson*, 139 B.R. 163, 166 (Bankr. E.D. Va. 1992)).

"As courts have noted, the 'problems inherent in ascertaining whether a debtor has acted with fraudulent intent are obvious,' because the debtor is the only person likely to testify and he is unlikely to admit that he acted with fraudulent intent." *Id.* at 483-484 (quoting *Williamson,* 828 F.2d at 252). Consequently, fraudulent intent may be established in one of two ways: first, fraudulent intent may be established by circumstantial evidence, or by inference drawn from a course of conduct; second, "courts have determined that a 'reckless indifference to the truth' constitutes the 'functional equivalent of fraud.'" *Id.* at 484 (citing *Williamson,* 828 F.2d at 252). "While any single omission or error may be the result of an innocent mistake, multiple inaccuracies are evidence of 'a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A).'" *Wolff v.*

15

*McChesney* (*In re McChesney*), 2012 WL 1856554, *2 (Bankr. D. Md 2012)(quoting *In re Hatton,* 204 B.R. at 484).  Although the subsequent disclosure of omitted information does not expunge a prior false oath, courts have consistently held that a debtor's later disclosure is "some evidence of innocent intent" and have further held that false statements due to mere mistake or inadvertence are insufficient to deny a debtor a discharge.  *In re Poffenberger*, 471 B.R. at 819-20 (quoting *Rosenbaum v. Kilson (Matter of Kilson),* 83 B.R. 198, 203 (Bankr. D. Conn.1988); *see also Robinson v. Worley*, 849 F.3d 577, 585 (4th Cir. 2017).  Similarly, a debtor's reliance on the advice of counsel made in good faith may negate an intent to defraud where the debtor demonstrates that she provided her attorney with all of the necessary facts and documentation. *Id.* at 586; *see also Rutili v. O'Neill (In re O'Neill),* 468 B.R. 308, 332 (Bankr. N.D. Ill. 2012)(finding no fraudulent intent where the debtors provided "voluminous information and documents to their bankruptcy counsel in reliance on counsel to completely and accurately complete the SFA and then reviewing the SFA and Amended SFA without sufficient care for their completeness").  Lastly, "an adjudication of fraudulent intent 'depends largely upon an assessment of the credibility and demeanor of the debtor.'" *Robinson v. Worley*, 849 F.3d at 585-86 (quoting *Williamson*, 828 F.2d at 252).

## Section 727(a)(5)

Section 727(a)(5) provides that the Court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C.A. § 727.  Section 727(a)(5) gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets.  *In re Martin*, 698 F.2d 883, 886 (7th Cir. 1983).  The initial burden is on the objecting party to

produce evidence establishing the basis for his objection, at which point the burden shifts to the debtor to explain satisfactorily the loss or deficiency of assets.  The debtor's explanation must be "reasonable and credible so as to satisfy the court that the creditors have no cause to wonder where the assets went."  *In re Farouki,* 133 B.R. at 777.  "The failure to offer documentary evidence to corroborate a debtor's testimony as to the loss or disposition of assets may justify the denial of a discharge pursuant to Section 727(a)(5)."  *Id.*

## Discussion

Plaintiffs contend that the Debtor omitted or misstated more than 40 items in her Initial Schedules, Amended Schedules, and Initial SOFA.  The Court begins with its overriding conclusions applicable to all of the Plaintiffs' claims.  These conclusions negate any inference that the Debtor acted with the requisite fraudulent intent or with reckless indifference to the truth, as necessary to establish a claim under §§ 727(a)(2)(A), (a)(4)(A), or (a)(5).  The Court will then address the specific omissions and misstatements alleged by the Plaintiffs as applicable.

The Court found the Debtor, Mr. Friedman, and Mr. Grossbart to be credible witnesses, and accepts their testimony.  The Debtor testified over the course of three trial days.  Because determinations of fraudulent intent largely depend upon the Court's assessment of a witness's credibility and demeanor, the Court carefully observed the Debtor throughout her testimony and found her to be a credible witness.

Much of the Debtor's testimony consisted of being walked through her bank statements from her accounts with First Citizens Bank and PNC Bank, admitted into evidence as Plaintiffs' Exhibits 7 and 9.  In doing so, the Debtor addressed the numerous omissions and misstatements in her initial bankruptcy filings.  Although the Debtor's testimony covered months of financial transactions, her defense was consistent and unrefuted and can be summed up as follows—the

Debtor disclosed all relevant information (especially including documents) to her bankruptcy attorney and she relied upon her attorney to accurately prepare her Schedules and SOFA because she did not know how to characterize many of the transactions now under scrutiny or where they would properly fit in the pigeonholes provided by the Schedules and SOFA.  The Debtor acknowledged that she reviewed her Petition and related filings and signed them under penalty of perjury but maintained that the process was "rushed" in light of an approaching discovery deadline in the Collection Action.  Moreover, she repeatedly emphasized that she filed bankruptcy during an extraordinarily stressful time in her life.  Her bankruptcy filing was on the heels of lengthy divorce and custody proceedings that involved allegations of the most upsetting and shocking nature, the mind-bending trauma of which still gripped her at the time of the bankruptcy and beyond.  As this Court previously opined, the depth and intensity of the Debtor's heartbreak and anguish upended her life prior to her bankruptcy filing.  She had to rehash this distressing history in great detail when she met with Mr. Grossbart on the eve of her bankruptcy filing.  That meeting was highly upsetting for both attorney and client, and understandably impacted the preparation of her bankruptcy documents.  Nevertheless, fault (and much less 'intent') did not lie with the Debtor.  She provided all required documents to Mr. Grossbart and to Mr. Friedman when requested, and relied on Mr. Grossbart's experience and expertise to accurately, and properly, present her financial situation.

Mr. Friedman has been a Chapter 7 Trustee for twenty-five years.  His testimony established that the Debtor and her counsel fully cooperated with him and provided him with all information he needed and requested.  He obtained an accurate understanding of the Debtor's cash flow, her rights and benefits under the Divorce Judgment, and her other meager assets and substantial liabilities.  He was satisfied that Ms. Spearman gave him all the information he

needed to conduct his responsibilities, and discharge his duties, as a Trustee in the case.  Indeed, the evidence established that many of the purported misstatements or inaccuracies alleged by Plaintiffs over the most significant matters—such as the amount of alimony and child support, the Debtor's sale of a car, the Debtor's receipt of proceeds of stock sale—Mr. Friedman understood from the Initial Schedules without the submission of additional information.

Mr. Friedman did not require any amendments to the schedules after the Meeting of Creditors.  This is significant.  It means that an experienced Chapter 7 Trustee concluded the disclosures, supplemented by the verbal explanations before and after the Meeting of Creditors, were accurate and sufficiently complete that they needed no supplementation or amendment.

Mr. Grossbart candidly admitted the Initial Schedules were not a paragon of perfection, although he takes great exception to the lengths to which the Plaintiffs go in their attempt to state a case, some of which will be discussed below.  Nevertheless, he took full responsibility for the lack of clarity and inaccuracies in the schedules.  He admitted that the Debtor provided him with all important information and did not conceal any financial information from him.  She gave him all the documents he requested and was candid in responding to his inquiries.  He understood she was relying on him to prepare the filings.

Mr. Grossbart admitted he made a mistake by not filing the case as a "bare bones."  He is correct that a "bare bones" filing would likely have eliminated much of the dispute in this proceeding.  As he acknowledged, he and the Debtor would have then had time to review the schedules in a less unsettled, hurried manner, if that choice had been made.  However, the failure to make that choice in this case should not be a death knell to Ms. Spearman's right to a discharge, in consideration of the totality of the circumstances.

In addition to the credibility of the three key witnesses, substantial circumstantial evidence supports the Court's conclusion that the Debtor did not act with the intent to defraud or intentional disregard for the truth. Many of the specific alleged omissions and misstatements asserted by Plaintiffs are directly tied to the benefits and rights that the Debtor obtained in the Divorce Judgment. *See* Findings of Fact, pp. 6-7. Significantly, the Debtor gave the Divorce Judgment to Mr. Grossbart prior to the filing and they discussed these rights and benefits at length. Mr. Grossbart fully understood the document. Further, he gave the Divorce Judgment to Mr. Friedman early in the case and before the Meeting of Creditors. He and Mr. Friedman had a number of conversations about it, and Mr. Friedman obtained a complete understanding of the Debtor's income and property entitlements both from the document itself and his discussions with counsel. It runs counter to a finding that Debtor acted knowingly and fraudulently, or with reckless indifference to the truth, that she and her counsel were so forthcoming in producing and explaining the document that had the greatest impact on her financial condition.

In addition, the Debtor gained nothing by the alleged omissions and misstatements. She gave all pertinent information and documents to Mr. Grossbart. She cooperated with him as best she could. Her emails to Mr. Grossbart evidence her willingness to satisfy his requests and meet her obligations. *See* ECF 121-3 pp. 5-16. The Plaintiffs theorize that she intentionally overstated expenses so she could pass the Means Test and not be required to convert to Chapter 13. Nothing supports this theory. The Debtor knew nothing about the Means Test, much less its impact, until after the petition was filed. Further, it was Mr. Grossbart, not the Debtor, who prepared the Means Test.

The foregoing establishes that the Debtor has acted throughout this process in utmost good faith and has made no attempt to hide or not disclose anything. To the contrary, she

explained her financial circumstances to Mr. Grossbart in great detail, she had no motive to hide any transactions, and she provided her attorney with all of the necessary facts and documentation. Her recent financial history, marked by the upheaval, uncertainty and emotional jumble of the domestic proceeding, involved atypical transactions that she did not know how to classify in the various bankruptcy documents. She relied upon Mr. Grossbart's expertise to complete the schedules and other filings and cooperated fully in providing all necessary information, and it certainly was not obvious to her that the filings were inaccurate. Mr. Grossbart was aware of all material information, had the necessary documents and, to be sure, could have done a much better job preparing the filings. He prepared the Initial Schedules in a hurried and unsettled manner, shaken by the Debtor's description of her allegations. As he acknowledges, he should have filed the case as a "bare bones" and, had he done so, it is likely this dispute would have been avoided. Finally, as Mr. Friedman's testimony establishes, the Initial Schedules were nowhere near as lacking as Plaintiffs' litany of deficiencies make out, especially taking into account that Mr. Grossbart filed the Amended Schedules before the Meeting of Creditors. Mr. Friedman did not require any amendments to the filings, which is evidence that the filings were sufficient in the view of an experienced Chapter 7 Trustee. The Court concludes that the Debtor did not act knowingly or fraudulently, or with reckless indifference to the truth, when she signed the Initial Schedules, the Initial SOFA or the Amended Schedules. Under the facts here, her reliance was justified and negates any inference of fraudulent intent. *See Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017) (holding that reliance on counsel generally absolves a debtor of fraudulent intent where the debtor acted in good faith and demonstrates that he provided the attorney with all of the necessary facts and documentation).

The inquiry does not end there, however.  The Court now turns to Plaintiffs' specific allegations of omissions and misstatements.  In doing so, the Court notes that many of Plaintiffs' alleged omissions and misstatements are matters that are disclosed in one section of the filings, but the Plaintiffs allege they should also be disclosed elsewhere.  For example, the Plaintiffs allege the Debtor should have disclosed on the SOFA that her parents held jewelry on her behalf.  But twice in the Initial Schedules, the Debtor expressly disclosed "engagement ring and earings [sic] held by debtors parents" in the amount of $4,500.  The Court also points out that the Plaintiffs often portray the Debtor's disclosure obligations in an overly pedantic fashion.  Thus, for example, the Plaintiffs contend the Debtor should have listed as an asset the total sum of all future child support payments, until the last minor or child reached the age of eighteen, an amount in excess of $300,000.  As Mr. Grossbart says, "Nobody answers that question that way."  The Court agrees with him.  It is almost as if the Plaintiffs sense that because the Debtor had no malice in her heart, they must, through redundancy, multiply every single omission by a factor of ten to construct a wall of shame, with the hope it will collapse and bury with confusion the Debtor's ability to explain.  The Court will not take the bait.

The question before the Court is whether the Debtor acted knowingly or fraudulently, or with reckless indifference to the truth.  Plaintiffs' dogmatic, purist approach to the alleged nondisclosures does little to support their claims.  Nevertheless, the Court now turns to the specific alleged omissions and misstatements.

## Omissions and Misstatements

The Debtor's Initial SOFA and Schedules contained the following omissions and/or misstatements:

Assertion:    Statement of Financial Affairs failed to disclose that the Debtor closed two bank accounts with Bank of America and one account with TD Ameritrade in March 2016.

Conclusion:    These accounts are the only omissions for which the Debtor admitted she did not provide information to her attorney.  The accounts were joint accounts used by the Debtor and her former husband during their marriage.  The Debtor and her former husband stopped using the accounts in July or August 2015, prior to their custody dispute, and the accounts were closed by her former husband in March 2016, nearly a year prior to her bankruptcy filing.  The Debtor did not realize she needed to include these accounts on the SOFA because they had been inactive for a long time prior to her bankruptcy filing.  ECF 65, Tr. 172-174.  The Court also puts any duty to disclose within the overall context of the Debtor's circumstances at the time the accounts were closed including the fact that she did not close them.  The Plaintiffs' assertion that these accounts should have been included on the SOFA does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:    Statement of Financial Affairs failed to state that the Debtor received $24,909.08 in loans from her parents between September 27, 2016 and December 29, 2016.

Conclusion:    The Plaintiff's theory is that loans from the Debtor's parent should have been included as income on the SOFA.  But to the Debtor's nonbankruptcy understanding, loans are liabilities, not income.  The Debtor listed twenty loans from her parents on Schedule E/F as unsecured obligations in excess of $700,000.  PX 6 at pp. 23-29.  Further, the dates of the loans are listed for sixteen of the twenty loans, including the loans made between September 2016 and December 2016.  *Id*.

In addition, along with the petition, Mr. Grossbart filed the Means Test.  On it, he listed "source of Income: parents loans" in the amounts of $23,242.95 in September 2016 and $39,382.67 in December 2016.  PX 27 at p. 13.

As Mr. Friedman testified:

> I was satisfied based on various sources: the 341, the information provided in the debtors' filings and through conversations with [Debtor's counsel] that I understood the cash flow coming in that was alimony, that was child support, and that was financial

23

> support from the debtors' parents. And I obtained information documenting all those sources.

ECF 66, Tr. 135:5-10.

Thus, the loans themselves were listed on Schedules E/F and the Means Test listed the loans made since September 2016 as income. The Plaintiffs' assertion that these loan amounts also should have been included on the SOFA as income does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:    Statement of Financial Affairs failed to disclose that the Debtor received $27,001.50 on December 22, 2016 from the sale of her former husband's stock.

Conclusion:   The Debtor told Mr. Grossbart about the $27,001.50 when she met with him before the Petition Date and provided him relevant documentation.  On the Means Test, filed on the Petition Date, Mr. Grossbart disclosed the Debtor's receipt of these funds as "Source of Income: husband's property distribution" in December 2016 in the amount of $27,001.50.  PX 27 at p. 12.

Although he had some questions about the specifics, Mr. Friedman understood from reading the Means Test that the Debtor received a "$27k" distribution from her husband.  ECF 121-3 at p. 23.

Thus, the Debtor disclosed the receipt and source of these funds to Mr. Grossbart and Mr. Grossbart disclosed the receipt and source of these funds on the Means Test.  A reader of the Form, such as Mr. Friedman, could readily understand that the Debtor received a distribution of husband's property in December 2016 in the amount of $27,001.50.  Plaintiffs' assertion that the amount of the proceeds and date of their receipt should also have been disclosed elsewhere in the Schedules does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:    Schedule A/B failed to disclose in answer to Question 29[7] that the Debtor was entitled to receive alimony in the amounts of $5,000 per month for thirty-six (36)

---

[7] Question 29 states "Family Support. Examples: *Past due or lump sum* alimony, spousal support, child support, maintenance, divorce settlement, property settlement."  PX 6 at p. 14 (emphasis added).

24

months and child support of $3,000 per month beginning November 1, 2016, pursuant to the Divorce Judgment.

Conclusion:    The Plaintiffs assert the Debtor should have essentially capitalized future alimony and child support payments and included them as an asset in response to Question 29 on Schedule A/B.  The Plaintiffs' calculate the total future alimony payments to be $160,000 and child support payments to be $432,000.

As Mr. Grossbart testified: "nobody completes that answer to that question that way."  ECF 136 at p. 114.  He explained it would be meaningless to list these future payments as an asset because a trustee cannot sell future alimony or child support payments and there was no way an estate (or creditors) can realize any value from these future payments.  He would list as an asset if the alimony or child support payments were in arrears on the petition date.  Here, there were none.

The Initial Schedules showed that the Debtor was receiving $5,000 of alimony and $3,000 of child support.  It is true that these amounts could have been identified more clearly, as they were in the Amended Schedules, but the information was adequately disclosed in the Initial Schedules.  As proof, after reviewing the Initial Schedules, Mr. Friedman wrote Mr. Grossbart and said "It looks like alimony payments of $5,000 a month?  And another $3,000 for child support. Is that correct?"  ECF 121-3 at p. 22.  Thus, a reader of the Initial Schedules, such as Mr. Friedman, could determine these amounts from the Initial Schedules.

The Debtor was not owed any "past due or lump sum" support payments as required by Question 29 on Schedule A/B.  Plaintiffs' strained reading of Question 29 does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:    Statement of Financial Affairs failed to disclose that the Debtor received the amount of $26,700 on January 12, 2017, from the sale of her 2015 Honda Odyssey.

Conclusion:    The Debtor told Mr. Grossbart at a pre-filing meeting that she received this amount from the sale of the Honda Odyssey.  She also explained that she owned the vehicle free and clear of liens and decided to sell it so that she would have cash available to pay upcoming bills and to pay some creditors, including the penalty to the IRS for liquidating her IRA and tax obligations for the alimony and

25

child support she received.  The Debtor deposited the sale proceeds into her checking account with PNC Bank and transferred $12,000 of the proceeds to her savings accounts at PNC Bank so it could accrue interest.  She then used those funds.  Two weeks later, the Debtor purchased a used GMC Acadia and transferred the remaining funds out of her savings accounts back into her checking account to make a down payment of $10,010 for the 2011 GMC.  The Debtor's initial Schedule D included a secured debt owed to CarMax for the 2011 GMC in the amount of $10,000.  The Debtor provided this information to her attorney and she relied on him to properly account for it in her bankruptcy papers.  ECF 65, Tr. 67-68, 118-120, 162-170; ECF 71, Tr. 24-25.

Along with the petition, Mr. Grossbart filed the Means Test.  On it, he disclosed the Debtor's receipt of these funds as "Source of Income: auto sale" in the amount of $26,700 in January 2017.  PX 27 at p. 12.

Mr. Friedman had no difficulty reading the form and understanding what it said: Debtor received $26,700 from the sale of the 2015 Honda Odyssey.  *See* ECF 121-3 at p. 22.

Thus, the Debtor disclosed the receipt and source of the funds to Mr. Grossbart and Mr. Grossbart disclosed the receipt and source of the funds with the Petition.  The Plaintiffs' assertion that the amount of the proceeds and date of their receipt should also have been disclosed elsewhere in the schedules does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:    Schedule A/B listed the Purlington Property as having a value of $450,000 despite the Debtor having a Zillow valuation estimating the value as $534,130.

Conclusion:   The Plaintiffs continue to press this contention despite the Purlington Property selling for $377,500, after being on the market for six or seven months during the case.  As Mr. Friedman said, the property needed maintenance and repairs.  The Debtor knew the property much better than Zillow, if that internet service can be said to truly 'know' anything at all about a property.  She also understood that her husband had obtained an appraisal on the Purlington Property in the amount of $450,000, and Mr. Grossbart told her an appraisal is better than a Zillow report.  The Plaintiffs' assertion that the Debtor intentionally undervalued the Purlington Property on the schedules by not using a Zillow valuation does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:       Statement of Financial Affairs failed to disclose that the Debtor was storing her engagement rings and earrings at her parents' house.

Conclusion:     At their meeting before the filing, the Debtor disclosed to Mr. Grossbart that jewelry was being held for her by her parents at their house.  She gave him a valuation used in the Divorce Case.  In the Initial Schedules on Schedule A/B, Mr. Grossbart listed under "Jewelry" "engagement ring and earings [sic] held by debtors parents" in the amount of $4,500."  PX 6 at p.12.  Indeed, this very disclosure is made two times on the Initial Schedules.  The Plaintiffs' assertion that this very same disclosure should also have been included in the SOFA does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:       Schedule A/B failed to disclose that the Debtor would be receiving an IRA rollover of $105,605 from her former husband as part of the Divorce Judgment and failed to include an IRA that the Debtor opened at USAA Federal Savings Bank on February 21, 2017, with an initial deposit of $1,250.

Conclusion:     Under the Divorce Judgment, the Debtor was to receive one-half of her former husband's interest in an IRA, valued at $105,605.  The Debtor told this to Mr. Grossbart when they met before the filing.  She also provided him with a copy of the Divorce Judgment, which they went over.  Mr. Grossbart was fully aware of this asset. The Debtor also told Mr. Grossbart about the USAA IRA.

In his haste to complete the schedules and in his stunned condition after hearing the Debtor's description of the divorce allegations, Mr. Grossbart did not include either of the IRA accounts on Schedule A/B, and also did not include them on Schedule C, listing exemptions.  Yet, no one disputes both assets are exempt.

Mr. Grossbart filed the Amended Schedules before the Meeting of Creditors and listed an IRA on Schedule A/B in the amount of $110,000, and also listed the IRA on Schedule C as exempt.  The $110,000 amount included both the $105,605 the Debtor is to receive under the Divorce Judgment and the $1,250 from the USAA IRA. As of trial, the Debtor had not received the distribution from her former husband's IRA.

It is true that, depending on the facts of a particular case, some courts state that the amendment of a schedule does not negate the inference of fraudulent intent in failing to disclose the asset.  Here, however, the Court concludes that Mr.

Grossbart's failure to include the IRAs in the Initial Schedules was a mere oversight, caused by the unique circumstances, and he quickly amended the schedules to add the IRAs before the Meeting of Creditors. Mr. Grossbart's inadvertent failure to include the IRAs in the Initial Schedules does not establish a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:    Schedule A/B failed to disclose that the Debtor was entitled to receive $87,413.87 from her former husband to pay 50% of the amount the Debtor owed to the Best Interest Attorney pursuant to the Divorce Judgment.

Conclusion:   This assertion is based on a strained reading of the Divorce Judgment. The Divorce Judgment expressly provided that:

> Husband currently owes the Best Interest Attorney, Renee Bronfein Ades, counsel fees in the amount of $105,539.33 ("Husband's Fees") through September 2016. Wife currently owes Ms. Ades counsel fees in the amount of $174,827.74 ("Wife's Fees") through September 2016. Husband agrees to pay Husband's Fees and half of Wife's Fees ($87,413.87) to Ms. Ades. Wife shall be responsible for paying the other half of Wife's Fees ($87,413.87) to Ms. Ades.

PX 5 at pp. 7-8. Thus, by court order, the Debtor was only responsible for paying $87,413.87 to Ms. Ades. On the Initial Schedules, Mr. Grossbart listed Ms. Ades as holding a secured claim against the Purlington Property in the amount of $90,000, which rounds up the $87,413.87 of the Debtor's liability under the Divorce Judgment because she was to be paid with interest. The disclosure in the Initial Disclosure of Debtor's obligation to Ms. Ades is adequate. Stated otherwise, the Debtor did not need to disclose that she was entitled to receive $87,413.87 from her former husband to pay 50% of Ms. Ades' fee (as Plaintiffs' allege), because a fair reading of the Divorce Judgment relieved the Debtor of the obligation to pay that 50% of the fee – the Circuit Court ordered the husband to pay it. Plaintiffs' assertion does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

28

Assertion:     Statement of Financial Affairs failed to disclose that the Debtor received $84,001.50 from her former husband from January 1, 2016 to February 27, 2017.

Conclusion:     The Initial SOFA disclosed that the Debtor received $20,000 from her ex-husband from January 1, 2016 to February 27, 2017, whereas her responses to discovery indicated that that she received $84,001.50 from him during that period. When asked about this discrepancy at trial, the Debtor indicated she was not sure how to characterize certain funds received from her former husband in the year prior to her bankruptcy filing. She did not start receiving the full $8,000 in child support and alimony per the Divorce Judgment until November 1, 2016. Prior to that, she was receiving $3,000.00 a month from her former husband in what her divorce attorney called "undifferentiated support." That amount also included the $27,001.50 proceeds from the sale of her former husband's unrestricted stock, which was disclosed on her Means Test. The Debtor provided Mr. Grossbart with all of the necessary information regarding monies received and she relied on him to accurately account for it in her Schedules. ECF 65, Tr. 134-135; PX 4, pp. 7-8. The Plaintiffs' assertion does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:     Schedule A/B and Statement of Financial Affairs failed to disclose that the Debtor opened two separate savings accounts at PNC Bank on January 17, 2017, one with an initial deposit of $2,000 and the other with an initial deposit of $10,000.

Conclusion:     The Debtor explained that she opened the PNC accounts to have access to a closer bank. The closest branch of First Citizens Bank was in Annapolis and it was inconvenient to drive to Annapolis with her three children whenever she needed to deposit money. She only listed one account with PNC Bank on her Initial Schedules despite having opened three accounts at PNC in January 2017 because the three accounts were part of a promotion offered by PNC Bank at that time. She testified that one account was a checking account, which was listed on Schedule B, and the other two were savings accounts that she only used to hold the proceeds from the sale of her vehicle for a two-week period before she transferred those funds back to her checking account to cover her expenses. Other than that, she did not use the savings accounts and considered the accounts "one account." ECF 65, Tr. 171-172; ECF 71, Tr. 23-24. Although disclosure of all three accounts was required, the Plaintiffs' assertion does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with

reckless indifference to the truth.  She opened the accounts as part of a promotion from PNC Bank and only used them one time to temporarily hold funds.

Assertion:  Statement of Financial Affairs failed to disclose that the Debtor received an IRA distribution in the amount of $53,530 in January 2016.

Conclusion:  This amount was taken from the Debtor's 2016 Federal Income Tax Return and reflects the liquidation of Debtor's IRAs in January 2016, more than a year before she filed her bankruptcy petition.  The Debtor discussed this transaction with Mr. Grossbart, who had the Debtor's tax returns.  The Debtor actually liquidated two IRAs in January 2016.  The liquidated amount totaled $59,353.96.  The Debtor used those proceeds to pay her attorneys' fees in her divorce/custody proceedings, including a $25,000 payment to Mr. Nicholson, a $1,500 payment to Ms. Gold, and a payment of $25,620.60 to replacement counsel in the Divorce Case.  She also paid $2,020 to her church to fulfill the remainder of her tithing pledge for the year.  PX 13, p. 18; ECF 65, Tr.121-123; ECF 71, Tr. 17-18, 55-56.  Although question 5 on the SOFA asks about income received in the two calendar years prior to filing, the Debtor was unsure if these transactions were required to be disclosed because they occurred more than a year prior to her filing and she did not consider the proceeds "income."  She disclosed the information to her attorney and relied on his expertise on whether it needed to be disclosed in her bankruptcy documents.  The Plaintiffs' assertion does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:  Statement of Financial Affairs failed to disclose that the Debtor deposited the amount of $59,353.96 into an account at First Citizens Bank on January 22, 2017.

Conclusion:  These are the proceeds from the IRAs that the Debtor liquidated as discussed above.  The Court reaches the same conclusion as above.

Assertion:  Statement of Financial Affairs failed to disclose that the Debtor paid a penalty in the amount of $5,353 on February 21, 2017, for closing an IRA.

Conclusion:  The Debtor paid this penalty in February 2017 when she filed her 2016 Federal Income Tax Return.  The amount owed was based on the liquidation of her IRAs as previously discussed.  The penalty was paid from the proceeds of the sale of her Honda Odyssey.  ECF 165, Tr. 147-148.  She disclosed the information to her attorney and relied on his expertise on whether it needed to be disclosed in her

bankruptcy documents.  The Plaintiffs' assertion does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion: Statement of Financial Affairs failed to disclose loans made to the Debtor by various friends and family members totaling approximately $7,375.

Conclusion: The Debtor had various friends give her money during her divorce proceedings to help her pay for basic living expenses.  The Debtor did not consider this assistance "income" because it was not earned income.  ECF 65, Tr. 117, 134, 198.  The Amended SOFA discloses that the Debtor received funds from various friends in 2016 ranging from $50 to $1,300.  PX 29 at p. 2.  The Plaintiffs' assertion that these loan amounts should have been included on the SOFA does not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.  These were relatively minor amounts received by the Debtor during her divorce proceedings that were used to pay for basic living expenses.

Assertion: Statement of Financial Affairs failed to disclose child support and alimony payments received from her former husband in the total amount of $49,000, all received during the calendar year preceding her bankruptcy filing.

Contention: The Divorce Judgment provided that the Debtor would receive $5,000 per month in alimony beginning in November 2016.  Mr. Grossbart listed those amounts on the Means Test, PX 27 at p. 12, and also listed $5,000 per month in the Initial SOFA.  PX 6 at p. 40.  He also listed the $3,000 of child support on Schedule I. PX 6 at p. 35.  Mr. Grossbart clarified the alimony and child support amounts in the Amended Schedules filed on March 24, 2017, before the Meeting of Creditors.  He also had the Debtor's 2016 tax returns before he filed the Initial Schedules.  Mr. Grossbart's disclosures could have been clearer about these amounts, but the disclosures he made support the conclusion that the Debtor did not omit or misstate information with the intent to deceive or with reckless indifference to the truth.

Assertion: Statement of Financial Affairs failed to disclose various consumer debts that were paid in the amount of $600 or more in the ninety (90) days preceding the bankruptcy filing including payments to USAA, Amazon, Chase, Johns Hopkins University, Safeway and Target.

Conclusion:     The Plaintiffs argued that these transactions were required to be disclosed on the Debtor's Statement of Financial Affairs in response to Question No. 6, which asks if a debtor has paid any creditor a total of $600 or more during the ninety days preceding the bankruptcy filing.  To a large extent, the level of detail the Plaintiffs required in response to this question stretches credulity.  Plaintiffs lumped multiple purchases from certain retailers together to meet that $600 limit, including multiple purchases from Amazon, Target, and Safeway for basic household items and groceries.  Other omitted transactions were monthly payments consisting of insurance payments, mortgage payments, home equity loan payments, credit card payments, insurance premiums—basic monthly payments that were evident from the bank statements she provided to her counsel.  The Debtor described these payments and transactions at trial while discussing her bank statements.  The Debtor also discussed airline purchases she made that were not disclosed and various other payments to computer forensic experts, court reporters, therapists, court-ordered professionals, tuition payments and estimated tax payments on account of the alimony she would be receiving.  She provided information regarding all of these expenses and payments to her attorney and she relied on his expertise in preparing her Schedules and other documents.  She did not try to financially enrich herself in the year prior to filing for bankruptcy.  Rather, all the money she spent was on her children to try to keep their lives as normal as possible during the domestic upheaval.  These omissions do not support a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:      Statement of Financial Affairs failed to disclose gifts totaling $850 given by the Debtor in the two (2) years preceding her bankruptcy filing.

Conclusion:     Similar to the conclusion above, the level of disclosure the Plaintiffs demanded of the Debtor stretches credulity.  Their pretrial memorandum points to three gifts given by the Debtor totaling $850, the most expensive being a $350 painting the Debtor gifted to her sister and her brother-in-law for their wedding.  The omission of these gifts from the Initial SOFA in no way supports a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

Assertion:      Statement of Financial Affairs failed to disclose charitable gifts/contributions totaling $16,440 made by the Debtor in the two (2) years preceding her bankruptcy filing.

32

Conclusion:      The Plaintiffs' pretrial memorandum states that the Debtor omitted $16,440 in charitable contributions from her Initial SOFA. The only charitable contributions discussed at trial were tithings the Debtor made to her church, all in minor amounts except for the $2,020 she paid from her liquidated IRA to fulfill her yearly pledge. The Amended SOFA explains that in April 2015, the Debtor pledged the amount of $13,750 to:

> Outward Bound to fund a program for the students of Frederick Douglass High School in the aftermath of the Freddie Gray riots. The programs occurred in the summer of 2015, after my separation. This was technically paid by my ex-husband through the T Rowe Price Charitable Giving Program.

PX 29 at p. 8. The omission of these donations from the Initial SOFA does not supports a claim that the Debtor omitted or misstated information with the intent to deceive or with reckless indifference to the truth.

As shown above, the specific allegations raised by Plaintiffs do not establish claims under §§ 727(a)(2)(A), (a)(4)(A), (a)(5).[8]

## Section 727(a)(7)

Plaintiffs' final claim is brought under § 727(a)(7). That section provides that the Court shall grant a debtor a discharge unless "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider." 11 U.S.C.A. § 727. Here, the Plaintiffs did not allege that the Debtor committed any acts in connection with another bankruptcy case. They misconstrue § 727(a)(7), which denies a debtor a discharge if the debtor has committed certain acts in another case under Title 11. *See In re Locke*, 11-10907-RGM, 2012 WL 3133926, at *2

---

[8] The Plaintiffs assert a seemingly endless list of omissions and misstatements, many of which are either redundant, or stretch the commonly understood meaning of the particular questions included in the Schedules and SOFA. Collectively, the majority of these assertions bring to mind the phrase, "piling on" and seem to suggest more about the weakness of the Plaintiffs' overall case than its strength, particularly under the singular circumstances presented. The Court reaches the same conclusion for any allegation not separately addressed above.

(Bankr. E.D. Va. Aug. 1, 2012); *see also In re Korfonta*, 08-16675-SSM, 2009 WL 4571852, at *2 (Bankr. E.D. Va. Dec. 2, 2009)("Discharge will also be denied [under § 727(a)(7)] if the debtor is guilty of such conduct in connection with the case of an insider during or within one year before the filing of the petition in his own case.").  As Plaintiffs failed to allege that the Debtor committed any acts in connection with another bankruptcy case, judgment shall be rendered in the Debtor's favor as to the § 727(a)(7) claim.

<u>**Conclusion**</u>

For the foregoing reasons, the Court finds that the Plaintiffs have not met their burden to deny the Debtor a discharge under §§ 727(a)(2)(A), (a)(4)(A), (a)(5) or (a)(7).  Judgment will be entered in favor of the Debtor.


cc:

Robert N. Grossbart, Esquire
1 North Charles Street, Suite 1214
Baltimore, MD 21201

Kathryn Jane Spearman
3303 Beech Ave
Baltimore, MD 21211

Sally B. Gold, Esquire
Law Offices of Sally B. Gold
201 North Charles Street, Suite 1630
Baltimore, MD 21201

Christopher W. Nicholson, Esquire
Turnbull, Nicholson & Sanders, P.A.
29 West Susquehanna Avenue, Suite 202
Towson, MD 21204

Marc R. Kivitz, Esquire
201 North Charles Street, Suite 1330
Baltimore, MD 21201

Gerard R. Vetter Esquire
Assistant U.S. Trustee
101 W. Lombard St., Suite 2650
Baltimore, MD 21201

## END OF MEMORANDUM